IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

                                    :

QUINTON JONES                       :

     v.                             :   Civil Action No. DKC 14-3539

                                    :

GT CONTRACTING CORPORATION          :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is a motion for summary judgment filed by Defendant GT Contracting Corporation ("Defendant" or the "GT"). (ECF No. 23). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background[1]**

This case involves claims of discrimination, retaliation, and harassment brought by Plaintiff against his former employer. Defendant is a construction company that is registered in Maryland and operates a work yard in Capitol Heights, Maryland. (ECF Nos. 2 ¶ 2; 24, at 4). Plaintiff is an African-American

---

[1]   The following facts are uncontroverted, alleged by Plaintiff, or construed in the light most favorable to him.

male who began his employment with Defendant in April 2013 as a skilled laborer. (ECF No. 24, at 4). He was hired by Fernando Barbosa, the president of GT, on the recommendation of Plaintiff's uncle, Julius Jones. Plaintiff had recently been released from prison on parole after approximately 20 years of incarceration. Defendant was Plaintiff's first employer since his release from prison. (*Id.* at 4-5).

In his role as a skilled laborer, Plaintiff worked on outdoor construction sites and received a starting hourly wage of $12.00. (*Id.* at 4). Defendant's laborers typically work in crews of six or seven people and report to the central work yard before traveling to assigned construction sites with their respective crews. As president, Mr. Barbosa was often present at the Capitol Heights work yard in the morning as employees reported for their work assignments. Each crew has a foreman to transport the employees to the construction site, allocate responsibilities among the laborers, and oversee the work on site. At GT, however, the foreman does not have authority to hire, fire, promote, set pay rates, or staff and assign work crews. (*Id.* at 5).

When Plaintiff began working for Defendant, he was assigned to a crew with Hector Marroquin, Jr. as foreman.[2] On November 8, 2013, Mr. Marroquin requested that Plaintiff retrieve some equipment from a truck. When "Plaintiff replied that he would do it after he finished moving the bricks" (ECF No. 2 ¶ 18), Mr. Marroquin "came up and grabbed [Plaintiff], then tugged on [him] and told [him] to go get the [equipment] off the truck [now]" (ECF No. 27-4, at 55). Concerned about engaging in a physical altercation that could jeopardize his release from prison, Plaintiff walked away and contacted his parole officer. (*Id.* at 56-57). Plaintiff alleges that Mr. Marroquin grabbed him by the shirt, but acknowledges that Mr. Marroquin did not strike Plaintiff and that Plaintiff did not suffer any physical injuries. (*Id.* at 57). Furthermore, Mr. Marroquin did not make any statements about race during this altercation. (*Id.* at 89-90).

Plaintiff reported the incident to Mr. Barbosa on or about November 12. (*Id.* at 119). Plaintiff also informed Mr. Barbosa that Mr. Marroquin made racist remarks to the effect of "I don't like black people." (*Id.* at 58). According to Plaintiff, Mr. Marroquin never used the word "nigger," but would remark that "black people don't work, black people don't do that, all the

---

[2] Plaintiff refers to Mr. Marroquin, his original foreman, as "Mr. Malacon" or by his nickname, "Geronni."

3

time." (*Id.*).  Plaintiff recounted to Mr. Barbosa two instances when Mr. Marroquin voiced these sentiments.  First, Plaintiff recalled that Mr. Marroquin and Plaintiff's uncle had an argument in which Mr. Marroquin said, "[Y]ou don't do nothing new all day, I don't like black people." (*Id.* at 61).  In the second incident, Plaintiff recollected that he, his uncle, and his cousin were working at a construction site in Beltsville, Maryland.  Mr. Marroquin walked up to them saying that "black people [are] always late . . . . [B]lack people don't like [to] work.  I don't like black people.  You all go home, go home." (*Id.* at 63).  Immediately thereafter, Plaintiff's uncle and Mr. Marroquin spoke and resolved the issue.

When Plaintiff made his complaint on November 12, Mr. Barbosa told Plaintiff to take the rest of the day off.  Mr. Barbosa later informed Plaintiff that he had investigated the matter by speaking to the supervisor and witnesses who were present.  (*Id.* at 71).  Also on November 12, after Plaintiff reported the physical altercation and Mr. Marroquin's two racial remarks to Mr. Barbosa, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").[3]  (ECF No. 24, at 6; *see* ECF No. 27-3).  The

---

[3] Although Mr. Marroquin was Plaintiff's original foreman during his employment with Defendant, it is apparent that Plaintiff also worked on crews with other foremen between April

written charge was not provided to Defendant for approximately one month. (ECF Nos. 24-2, at 4 ("[Defendant] first learned of Plaintiff's complaint with the [EEOC] in or around early December[] 2013, when [it] received a Notice of Charge from the EEOC."); 27, at 4).

Plaintiff did not return for one week. When he did return, Plaintiff was not subjected to any disciplinary measures and was assigned to a new crew with a different foreman. (ECF No. 24, at 7). Anxious about another physical altercation with Mr. Marroquin, Plaintiff was "[a]pprehensive but happy" that Mr. Barbosa assigned him to a new crew. (ECF No. 27-4, at 73). Plaintiff testified that he decided not to complain to Mr. Barbosa about workplace harassment and racial slurs because he "just wanted to keep [his] job. [Plaintiff] didn't want to complain about [it]." (*Id.* at 118). Plaintiff also explained that he failed to report the harassment because Mr. Barbosa did not give Plaintiff the opportunity to describe fully the nature of the racially-motivated harassment he felt on the job. According to Plaintiff, "Mr. Barbosa, when you talk to him, he screams at you. . . . He [doesn't] give you a chance to

---

and November 2013. Plaintiff's EEOC charge, filed on November 12, alleges the use of racial slurs by another foreman, Mr. Nery "Nutty" Cortez, as well as two co-workers. Plaintiff, however, does not recall precise dates or time periods. (*See* ECF No. 27-4, at 97-98).

communicate." (*Id.* at 119-20).   Even so, when Plaintiff complained of the physical altercation with Mr. Marroquin's to Mr. Barbosa, he did report two race-based statements by Mr. Marroquin.

As of November, when he had only received Plaintiff's oral complaint, Mr. Barbosa "believed that the placement of Plaintiff on a crew separate from Mr. Marroquin[] resolved the incident between the two men." (ECF No. 24-2, at 4; *see* ECF No. 27-4, at 163).   Mr. Barbosa maintains that he was first alerted to Plaintiff's allegations of racially-charged statements at the workplace upon receipt of the written EEOC charge. (ECF No. 24-2, at 4).   Mr. Barbosa states that, when he learned of Plaintiff's written EEOC charge in December, he "spoke with Plaintiff about the allegations . . . . [He] confirmed with Plaintiff that things were going well on his new crew and any issues that may have existed were resolved." (*Id.*).   Plaintiff submitted an affidavit declaring that, "[u]pon receipt of [his EEOC] complaint, . . . Mr. Barbosa called [him] into his office and was belligerent.   He told [Plaintiff]: 'What the fuck is this?   Why are you creating problems for my company?   I don't have time for this.'" (ECF No. 27-1, at 3).

Plaintiff worked with foremen Mr. Cortez, Mr. Francisco, and Mr. Hector, among others, during his remaining time in

6

Defendant's employ.   (ECF No. 27-4, at 80-81).[4]   Plaintiff asserts that, after his return to work and assignment to a crew with Mr. Hector as foreman, Mr. Hector denied Plaintiff lunch breaks almost every day.  (ECF No. 27-4, at 81-84).  Plaintiff's co-workers on the crew, including black and Hispanic laborers, were given time to eat lunch.  Plaintiff speculates that he was denied lunch breaks as a result of filing his EEOC charge.  (*Id.* at 86).  He does not offer any evidence, however, that he reported the denial of lunch breaks to any supervisors of GT management.  Similarly, Plaintiff speculates that he was docked pay due to his protected EEOC complaint.  When Plaintiff noticed that ten hours were missing from his paycheck, he took the advice of a co-worker who suggested that Plaintiff "write it up and just act like you kept hours.  Even though [Plaintiff] didn't keep them, [he] wrote them up."  (*Id.* at 87).  Plaintiff showed the document to Mr. Barbosa and Mr. Hector, who acknowledged his mistake, and Plaintiff was reimbursed.  (*Id.* at 87-88).  Plaintiff has no evidence that any of Defendant's foremen were aware of Plaintiff's EEOC charge.  (*Id.* at 151-52).

In addition, Defendant maintains an employee handbook and posts employer policies establishing a company protocol for

---

[4] Plaintiff does not provide full names for these foremen. Throughout the record, Plaintiff refers to Mr. Cortez as "Mr. Cortes" and "Nutty."  Defendant also identifies "Foreman Nutty" as Nery Tobar.  (*See* ECF No. 24-1, at 88).

employees to report complaints to "his or her supervisor, their supervisor's manager before the conduct becomes severe or pervasive, regardless of the offender's identity or position." (ECF No. 24-2, at 15-16).   Plaintiff was aware of these policy documents posted in Defendant's office.   (ECF No. 27-4, at 171).

Plaintiff asserts that offensive language was used often by Defendant's employees at construction sites.   According to Plaintiff, it began during his first week of employment with Defendant:

> When I first heard the word nigger used on the site when I was working, it was from Diego, but he used it frequently, like it's – and I figured it was because . . . he thought it was cool to use it, and he used it in that term, like, hey, nigger, like it's a good thing.   So I told him, don't – you don't do that.   You don't do that.   You don't use that word.

(*Id.* at 90).   Plaintiff was offended by his co-worker's use of the racial slur because he "didn't think Diego had a clear understanding [of] what that term meant, and I wanted him to understand what it meant to me."   (*Id.* at 100-01).   Plaintiff complained about the use of the racial slur to his uncle, but he never reported its use to Mr. Barbosa or any supervisor at GT. (*Id.* at 95, 104, 118).   Although Plaintiff denies that Mr. Marroquin used the word "nigger" (*id.* at 58), Plaintiff asserts that Mr. Marroquin and others referred to black employees as "monkeys."   (*Id.* at 92-94).

Plaintiff further states that another foreman, Mr. Cortez, also used the racial slur.  Plaintiff recalled instances when Mr. Cortez would walk past Plaintiff and co-workers at break time and ask, "[W]hat, you all having a nigger moment?  Or if you're smoking – if I pulled out a pack of cigarettes in the truck, he like, only black people smoke . . . them nigger cigarettes." (*Id.* at 98).  Mr. Cortez continued to use the term despite Plaintiff's requests that he stop. (*Id.* at 98-99).  Mr. Cortez used the racial slur more than ten times in Plaintiff's presence, but never around managers or other foremen. (*Id.* at 113-15).  Mr. Cortez also used the Spanish words "moreno" and "negro" to refer to Plaintiff and other black employees. Plaintiff understood these terms were directed at him by co-workers and foremen because "they point[ed] at [Plaintiff]" and said, "[G]et the negro to do it, or . . . get the moreno." (*Id.* at 103).

Plaintiff did not use racial slurs on the job site, but his cousin and uncle – both African-American males – did. (*Id.* at 99-100).  Plaintiff did not take offense when other black employees used the term because they did not use it "in a derogatory way . . . meant to cause [Plaintiff] problems." (*Id.* at 101).  He acknowledged that "it didn't sound like [his non-black co-workers were] using [the slur] offensively," but "it became disrespectful" after Plaintiff had asked them to stop.

(*Id.* at 102). In addition, derogatory terms and slurs were written in the bathroom stalls or walls at job sites. (*Id.* at 106). During another incident in January 2014, a co-worker, Mr. Tómas, confronted Plaintiff and used the Spanish word, "negro," when referring to Plaintiff. Upset that Plaintiff had not finished digging a hole, Mr. Tómas approached Plaintiff and said, "I fucking kick you in your face. . . . Fucking negro, I fucking kick you in your face." (*Id.* at 107). Once again, Plaintiff did not complain to Mr. Barbosa or GT management about the incident. (*Id.* at 108).

Plaintiff received a raise in January 2014. (*Id.* at 196-97). Defendant's construction work slowed during the winter months, however, and by February "there wasn't work for a couple of weeks." (*Id.* at 133; see ECF No. 24-2, at 5). Plaintiff's uncle suggested that they take unemployment, and they asked GT personnel in Mr. Barbosa's office to be laid off. (ECF No. 27-4, at 134). After receiving unemployment benefits for six months, Plaintiff did not return to Defendant for work because he "wanted another job. [He] didn't really want to go back there." (*Id.* at 135). While drawing unemployment benefits, Plaintiff searched for other employment and education opportunities. (*Id.* at 137). During his search, Plaintiff listed Mr. Barbosa as a job reference. (*Id.* at 143). Plaintiff acknowledges that he requested the "winter layoff" and has no

reason to believe that he would not have been allowed to resume employment with Defendant as a laborer had he returned. (*Id.* at 144-45). According to Mr. Barbosa, Plaintiff was "welcome to return to work at GT at any time." (ECF No. 24-2, at 5).

**B.   Procedural History**

Plaintiff filed an EEOC charge alleging discrimination on November 12, 2013. (ECF No. 27-3). Defendant received notice of the charge from the EEOC in December 2013 and responded on April 18, 2014. (ECF No. 24, at 7; *see* ECF No. 24-1, at 87). On September 15, 2014, Plaintiff initiated this action against Defendant in the Circuit Court for Prince George's County. (ECF No. 2). The six-count complaint alleges: discriminatory termination in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.* (Count I); unlawful retaliation under MFEPA (Count II); unlawful harassment in violation of MFEPA (Count III); discriminatory termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count IV); unlawful retaliation under Title VII (Count V); and unlawful harassment in violation of Title VII (Count VI).[5]

---

[5] The complaint mislabels Count VI as duplicative of Count III. (ECF No. 2, at 6). This memorandum opinion will refer to Count VI. In addition, Plaintiff fails to cite the appropriate MFEPA section. *See* Md. Code Ann., State Gov't § 20-606.

Defendant timely removed the case to this court on the basis of federal question jurisdiction over claims brought under Title VII. (ECF No. 1). On November 26, Defendant answered the complaint. (ECF No. 14). Defendant moved for summary judgment (ECF No. 23), Plaintiff responded in opposition (ECF No. 27), and Defendant replied (ECF No. 28).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on those issues for which the nonmoving party has the burden of proof, it is his or

her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). Although *pro se* litigants are to be given some latitude, the above standards apply to everyone. Thus, as courts have recognized repeatedly, even a *pro se* party may not avoid summary judgment by relying on bald assertions and speculative arguments. *See Smith v. Vilsack*, 832 F.Supp.2d 573, 580 (D.Md. 2011) (citing cases).

## III. Analysis

Plaintiff's six-count complaint alleges that Defendant discriminated against Plaintiff by fostering a hostile work environment, retaliating against Plaintiff in response to his EEOC charge, and terminating his employment due to his race.

### A.   Discriminatory Discharge Claims (Counts I and IV)

Plaintiff has alleged identical claims for discriminatory discharge under Title VII and MFEPA. "The MFEPA is the state law analogue of Title VII. Maryland courts interpreting MFEPA

have often found federal cases arising under Title VII to be persuasive authority." *McCleary-Evans v. Maryland Dep't of Transp.*, No. ELH-12-1550, 2015 WL 1285325, at *22 (D.Md. Mar. 20, 2015) (citations and internal quotation marks omitted), *aff'd*, No. 15-1409, 2016 WL 362287 (4th Cir. Jan. 29, 2016). When, as here, the "plaintiff has not asserted a distinction between [his] federal and Maryland discrimination claims," the court will apply the same standards of analysis under Title VII and MFEPA. *Id.* (citing *Blakes v. City of Hyattsville*, 909 F.Supp.2d 431, 444 (D.Md. 2012)).

Title VII prohibits status-based discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013). To survive a motion for summary judgment, a plaintiff must provide evidence of intentional discrimination through one of two avenues of proof: (1) direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision; or (2) the *McDonnell Douglas* "pretext framework" that requires a plaintiff to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for [discrimination]." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450

U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)). Here, Plaintiff must rely on the *McDonnell Douglas* framework because he offers no direct evidence of discrimination.[6]

Under the *McDonnell Douglas* framework, once a plaintiff meets his initial burden of establishing a *prima facie* case for discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. Once the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of

---

[6] Plaintiff argues that he provides direct evidence of unlawful discrimination. (ECF No. 27, at 6). Direct evidence of discrimination, however, includes "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted). If believed, direct evidence "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (citation and internal quotation marks omitted), *rev'd on other grounds*, 517 U.S. 308 (1996). Plaintiff presents no direct evidence that Defendant terminated his employment due to unlawful retaliation or race discrimination.

intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal quotation marks omitted).

To establish a *prima facie* case of discriminatory discharge, Plaintiff must show that he is: (1) a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Hill*, 354 F.3d at 285. Here, Plaintiff fails to establish a *prima facie* case of discrimination because he has not put forth sufficient evidence to satisfy the second and fourth prongs.

Defendant challenges whether Plaintiff can demonstrate an adverse employment action. (ECF No. 24, at 12). "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). It "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).   Critically, Plaintiff cannot demonstrate that he was discharged or demoted, or that he otherwise suffered an adverse employment action.   Plaintiff *asked* to be laid off in order to receive unemployment benefits.   (ECF No. 27-4, at 134).   During his deposition, Plaintiff conceded that Defendant had not terminated his employment on the basis of race.   (*Id.* at 146).   In fact, Defendant obliged Plaintiff's layoff request in order to be helpful.   (*Id.* at 149-150).   Plaintiff drew unemployment benefits for six months, searched for other employment and educational opportunities, and ultimately decided not to return to Defendant's employ.   (*Id.* at 134-138, 144-145).   Accordingly, he cannot demonstrate an adverse employment action by requesting to be laid off during the slow winter months and then choosing not to seek work with Defendant again.

Similarly, Plaintiff offers no evidence that his "position remained open or was filled by [a] similarly qualified applicant[] outside the protected class." *Hill*, 354 F.3d at 285 (citation omitted).   Indeed, as a general rule in the United States Court of Appeals for the Fourth Circuit, "Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a *prima facie* case." *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005).   Aside from evidence that Plaintiff's uncle, an African-American male,

returned to work after drawing unemployment benefits, Plaintiff puts forth no evidence regarding Defendant's employees after February 2014.   Accordingly, Plaintiff cannot establish the fourth prong of a *prima facie* case of discriminatory discharge.

Even assuming *arguendo* that Plaintiff can establish a *prima facie* case of discriminatory discharge, Defendant advances a legitimate, nondiscriminatory reason for its purported decision to terminate Plaintiff's employment.   Contrary to the allegations in the complaint, Plaintiff conceded that Defendant did not terminate his employment or discharge him due to his race.   Plaintiff requested to be laid off so that he could collect unemployment benefits and search for other employment or educational opportunities.   In order to show pretext, Plaintiff must "prove both that the reason was false, *and* that discrimination was the real reason." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (emphases in original) (citation and internal quotation marks omitted).   Moreover, "plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of nondiscriminatory reasons for an adverse employment action." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (citation and internal quotation marks omitted). Here, because the uncontroverted evidence shows that discrimination was not the reason for Plaintiff's layoff,

Defendant is entitled to summary judgment on the discriminatory discharge claims in Counts I and IV.

**B.  Retaliation Claims (Counts II and V)**

Plaintiff alleges only that, "[b]y and through its conduct, Defendant retaliated against Plaintiff for filing a racial discrimination claim with the EEOC" in violation of Title VII and MFEPA.  (ECF No. 2 ¶¶ 36, 51).  As in the discriminatory discharge context, MFEPA "tracks Title VII's anti-retaliation provision and pursues the same objectives." *Jarvis v. Analytical Lab. Servs., Inc.*, No. RWT-10CV1540, 2011 WL 3680257, at *9 (D.Md. Aug. 19, 2011) (citing *Chappell v. Southern Maryland Hosp., Inc.*, 320 Md. 483, 494 (1990)), *aff'd*, 459 F.App'x 292 (4th Cir. 2011).

Title VII prohibits retaliation by the employer against employees who engage in a protected activity.  42 U.S.C. § 2000e-2(a).  Protected activity includes opposing "unlawful employment practice[s] [under] this subchapter" or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in . . . [a Title VII] investigation, proceeding, or hearing[.]"  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) the protected activity was causally connected to the adverse action.  *See Balas v.*

19

*Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410 (4th Cir. 2013); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).   Again, because Plaintiff presents no direct evidence of retaliation, his retaliation claim will be analyzed under the *McDonnell Douglas* framework.   *See Staley v. Gruenberg*, 575 F.App'x. 153, 155 (4th Cir. 2014).   Plaintiff engaged in protected activity by filing an EEOC charge in November 2013, and Defendant received notice of the charge the following month. Defendant asserts that Plaintiff cannot establish the second and third prongs of a *prima facie* retaliation case.   (ECF No. 24, at 22).

There can be no viable argument that Defendant terminated his employment in retaliation for filing the EEOC charge because the evidence demonstrates that Plaintiff voluntarily requested to be laid off in order to draw unemployment benefits.   As a result, Plaintiff cannot demonstrate an adverse employment action, and his *prima facie* case of retaliation fails.   It also bears repeating that, as explained above, Defendant has provided a legitimate, nondiscriminatory reason for laying off Plaintiff, which is that the pace of work slowed in the winter months and Plaintiff requested to be laid off in order to collect unemployment benefits.   Beyond offering mere speculation and inference, Plaintiff concedes that he has no evidence to the contrary.   (*See* ECF No. 27-4, at 146-50).   As with his

20

discriminatory discharge claim, Plaintiff fails to provide evidence - or even a forecast of evidence - that Defendant's explanation constitutes pretext.

Furthermore, to the extent that Plaintiff argues that the denial of lunch breaks or his docked pay constitute unlawful retaliation, Plaintiff cannot show any causal connection. A causal connection "exists where [an] employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (citation omitted). In addition, because "an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Smith v. Vilsack*, 832 F.Supp.2d 573, 586 (D.Md. 2011) (citations and internal quotation marks omitted). Here, Defendant did not receive notice of Plaintiff's EEOC charge until December. (ECF Nos. 24-2, at 4; 27, at 4). Plaintiff offers no evidence that Mr. Hector was aware of the EEOC charge at the time he allegedly denied Plaintiff's lunch breaks or docked his pay. (*See* ECF No. 27-4, at 86). Moreover, Plaintiff agreed that linking the denial of his lunch breaks to the EEOC charge is mere speculation. (*Id.*). Concerning the lost hours on Plaintiff's

paycheck, he similarly conceded that a causal connection with the EEOC charge is only speculative. (*Id.* at 87).

Plaintiff cannot point to any evidence that raises a genuine issue of material fact about the Mr. Hector's awareness concerning his earlier EEOC charge. Knowledge of an applicant's prior protected activity alone would be insufficient to establish causation for the purposes of retaliation. *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998) (citations omitted). There must be evidence that Defendant was motivated in some way by Plaintiff's protected activity to take adverse employment action. *See id.* Here, Plaintiff presents no such evidence, and he cannot create a genuine issue of material fact through mere speculation or the building of inference upon inference. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, there can be no causal connection between Plaintiff's protected activity and any adverse employment actions taken by Defendant or its employees. Summary judgment will be entered against Plaintiff on the retaliation claims in Counts II and V.

### C. Hostile Work Environment Claims (Counts III and VI)

Plaintiff alleges that, "[b]y and through its conduct, Defendant subjected Plaintiff to a hostile work environment [due to] racial harassment" in violation of Title VII and MFEPA. (ECF No. 2 ¶¶ 41, 56). Given that "Maryland courts routinely

look to the Title VII context to determine the scope of liability under the [MFEPA]," Plaintiff's identical claims of hostile work environment will be analyzed together. *Roberts v. Office of the Sheriff for Charles Cty.*, No. DKC-10-3359, 2012 WL 12762, at *11 n.17 (D.Md. Jan. 3, 2012) (citations omitted). Under Title VII, a hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

To prevail on a hostile work environment claim, a plaintiff must show that there is: (1) unwelcome conduct; (2) that is based on the plaintiff's race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015); *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). Courts determine whether an environment is sufficiently hostile or abusive by looking at all of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

23

utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citation and internal quotation marks omitted).   Here, Defendant challenges whether Plaintiff can show that the harassment was sufficiently severe or pervasive and that the harassment is imputable to Defendant.

Plaintiff argues that he experienced severe or pervasive harassment that altered his conditions of employment and created an abusive work environment.   (ECF No. 27, at 9).   As detailed above, Plaintiff has presented evidence that he was subjected to numerous racial slurs and racist declarations at the workplace by co-workers and foremen alike.   Even assuming that the physical altercation with Mr. Marroquin was not based on Plaintiff's race, there remains sufficient evidence of an abusive and hostile work environment.   The slurs he says were used by Defendant's employees – "nigger" and "monkey" – are odious epithets far beyond mere offensive utterances.   The use of "the word 'nigger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). "Similarly, describing an African-American as a 'monkey,' and thereby 'suggest[ing] that a human being's physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." *Boyer-Liberto*, 786 F.3d at 280 (quoting *Spriggs*, 242

F.3d at 185).   "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Spriggs*, 242 F.3d at 185 (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).   The evidence of frequent and highly repugnant racial slurs is sufficient to demonstrate a severe or pervasive (or both) hostile work environment for a person of ordinary sensibilities. *See id.*   There is also sufficient evidence that Plaintiff himself regarded the conduct as offensive, as he testified that he complained to Mr. Barbosa of Mr. Marroquin's racist declarations and to both Mr. Cortez and Diego about their use of racial slurs.   Accordingly, a reasonable jury examining the totality of the circumstances could find that Plaintiff was subjected to severe or pervasive conduct, based on his race, that created an abusive work environment during his employment with Defendant.

Plaintiff must also demonstrate, however, that the hostile work environment is imputable to Defendant.   Employers are not automatically liable for acts of harassment levied by co-workers or supervisors against subordinates.   Rather, there must be some basis in law for imputing the acts of co-workers or supervisors to the employer, and the status of the harasser is relevant.

Regarding harassment by co-workers, the Fourth Circuit has "held that an employer cannot be held liable for isolated remarks of its employees unless the employer 'knew or should have known of the harassment, and took no effectual action to correct the situation.'" *Spicer v. Com. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)); *see Ellerth*, 524 U.S. at 759 (noting that "[n]egligence sets a minimum standard for employer liability under Title VII"). In cases of harassment by a supervisor "with immediate (or successively higher) authority over the employee," an employer may be found vicariously liable. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807–08).[7] The employer may escape liability if it demonstrates, "as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer

---

[7] The harasser qualifies as a supervisor, rather than a co-worker, "if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013). An employee so empowered can "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 2443 (quoting *Ellerth*, 524 U.S. at 761). A supervisor has the "authority to inflict direct economic injury." *Id.* at 2448.

provided" or to avoid harm otherwise.  *Vance*, 133 S.Ct. at 2439;
*see Spriggs*, 242 F.3d at 186.

Plaintiff offers no evidence that Defendant's foremen were
supervisors, "empowered by the employer to take tangible
employment actions against the victim."  *Vance*, 133 S.Ct. at
2439.   Here, according to Mr. Barbosa, work crews "have a
foreman to drive them to the job site, assist with the
allocation of job duties, and help oversee the workers while at
the job site.   The foremen have no authority to set pay rates,
hire or fire."   (ECF No. 24-2, at 2).   The uncontroverted
evidence is that Mr. Barbosa is "solely responsible for all
decisions related to hiring, firing, setting pay rates and
promoting employees."  (*Id.* at 3).   Defendant's foremen "did not
possess any hierarchical significance . . . and are perhaps best
characterized as team leaders or firsts among equals . . . as
opposed to the types of employees that could be considered
supervisors for establishing vicarious liability."   *E.E.O.C. v.
L.A. Pipeline Constr., Inc.*, No. 2:08-CV-840, 2010 WL 2301292,
at *11 (S.D.Ohio June 8, 2010); *see E.E.O.C. v. Ralph Jones
Sheet Metal, Inc.*, 777 F.Supp.2d 1119, 1124 (W.D.Tenn. 2011)
(explaining that because the foreman "exercised supervisory
authority, imposed discipline, and influenced hiring and firing
at the company," he "clearly functioned as a supervisor" such
that his actions were attributable to the defendant); *E.E.O.C.*

27

*v. Ceisel Masonry, Inc.*, 594 F.Supp.2d 1018, 1025 (N.D.Ill. 2009) ("The bulk of [the foreman's] job duties consisted of supervising the work of bricklayers and laborers and ensuring the safety of the jobsite.  [The foreman] did not have the authority to hire, fire, demote, promote or transfer employees.").  "In the absence of the requisite authority, a title such as 'foreman' does not transmogrify a line employee into a supervisor for Title VII purposes." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 10 (1st Cir. 2011) (citing *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850-51 (8th Cir. 2005)). Defendant's foremen are not supervisors under Title VII, and the court need not consider whether Defendant has established the affirmative defense to vicarious liability.

Although Plaintiff creates no material dispute of facts as to whether Defendant's foremen can be deemed supervisors, Defendant nonetheless can be liable for a hostile work environment created by co-workers "if it was negligent in controlling working conditions." *Vance*, 133 S.Ct. at 2439. Under the negligence standard, Defendant may be liable "if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree*, 335 F.3d 333-34 (citing *Spicer*, 66 F.3d at 710).  Moreover, "a plaintiff seeking to impute liability to [his] employer for harassment by a co-worker may not be able to establish the employer's negligence if

[he] did not report the harassment." *Boyer-Liberto*, 786 F.3d at 278.   Here, Plaintiff complained orally to Mr. Barbosa of the physical altercation with Mr. Marroquin, as well as two separate incidents during which Mr. Marroquin, in the presence of Plaintiff, stated that he did not like black people.  Plaintiff, however, never reported the harassing conduct of co-workers and foremen directly to Mr. Barbosa or any supervisor at GT.  (ECF No. 27-4, at 95, 104, 118).   Plaintiff also was aware that Defendant maintained company policies establishing a protocol for employees to report complaints of harassment.  (*Id.* at 171). Until receiving Plaintiff's EEOC charge in December 2013, Mr. Barbosa knew only that Plaintiff and Mr. Marroquin had a single physical altercation and that Plaintiff heard Mr. Marroquin make two racially insensitive remarks.   In November, Mr. Barbosa sought to remedy the situation by placing Plaintiff on a crew with a different foreman.   By separating Plaintiff and Mr. Marroquin, Mr. Barbosa believed that he had resolved the incident.  (ECF No. 24-2, at 4; *see* ECF No. 27-4, at 163).

Plaintiff's written EEOC charge, filed in November 2013 but not received by Defendant until the following month, provided Defendant with notice of allegations beyond the circumstances of Plaintiff's alteration with Mr. Marroquin.   The charge described the harassing use of racial slurs by co-workers and foremen, including Mr. Cortez.  (ECF No. 27-3, at 2 ("I was

subjected to racially offensive comments and conduct by my co[-
]workers and [f]oremen.  For example, . . . a co[-]worker said,
'Nigger do this,' or 'Nigger do that.'  [Mr. Cortez] said to a
[b]lack co[-]worker and me, 'What is this?  A nigger
moment?'")).  There is no evidence that Plaintiff complained of
the pervasive use of racial slurs to Mr. Barbosa directly
through company complaint protocol or in any informal manner.
Neither is there evidence that Mr. Barbosa and GT management
were aware of alleged workplace harassment before receiving
notice of Plaintiff's EEOC charge in early December.  When
Defendant "received a Notice of Charge from the EEOC," however,
it "became aware of Plaintiff's allegations of racially-charged
statements at the workplace."  (ECF No. 24-2, at 4).  The
question is, then, whether Defendant responded promptly and
effectively, and whether Plaintiff was subjected to workplace
harassment between December 2013 and February 2014, when
Plaintiff requested to be laid off.  *See Spicer*, 66 F.3d at 711
("When presented with the existence of illegal conduct,
employers can be required to respond promptly and effectively,
but when an employer's remedial response results in the
cessation of the complained of conduct, liability must cease as
well.").

There is evidence on the record that Plaintiff was
subjected to race-based workplace harassment after Defendant

received notice of his EEOC charge in December.  In January 2014, a co-worker, Mr. Tómas, confronted Plaintiff and referred to him by the Spanish word, "negro."  Mr. Tómas said to Plaintiff, "I fucking kick you in your face. . . . Fucking negro, I fucking kick you in your face." (ECF No. 27-4, at 107).  Construing the facts in the light most favorable to Plaintiff, there is evidence of continued racial harassment after Defendant received notice of Plaintiff's EEOC charge. Consequently, the court must consider whether Defendant responded promptly and effectively, which is in effect an affirmative defense under the negligence standard.

There is a genuine issue of material fact concerning Defendant's response to Plaintiff's harassment allegations. According to Plaintiff, "Upon receipt of [the EEOC] complaint, . . . Mr. Barbosa called [him] into his office and was belligerent.  He told [Plaintiff]: 'What the fuck is this?  Why are you creating problems for my company?  I don't have time for this.'" (ECF No. 27-1, at 3).  Plaintiff also noted that, "[t]hereafter, my work environment became even more hostile" as "derogatory abuse" continued.  (*Id.*).  Defendant's version of events creates a genuine issue of material fact:

> "After [Defendant] received the [c]harge, [Mr. Barbosa] spoke with Plaintiff about the allegations . . . . During that conversation, Plaintiff indicated to [Mr. Barbosa] that he was on parole, and his

> parole officer told him to file the EEOC
> [c]harge following his decision to walk off
> the jobsite.   [Mr. Barbosa] confirmed with
> Plaintiff that things were going well on his
> new crew and any issues that may have
> existed were resolved."

(ECF No. 24-2, at 4).   Accordingly, the parties dispute whether Defendant responded promptly and effectively upon receiving notice of alleged race-based harassment.   Although "[t]he law against harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists," Plaintiff's EEOC charge placed Defendant on notice of harassing conduct beyond Plaintiff's altercation with Mr. Marroquin. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (citation and internal quotation marks omitted). Defendant "cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy." *Ocheltree*, 335 F.3d at 334.

Liability cannot be imputed to Defendant under a negligence standard for any harassment occurring before Defendant received notice of Plaintiff's EEOC charge in December 2013.   Thus, Defendant is entitled to summary judgment on hostile work environment claims in Counts III and VI arising from harassment prior to December.   There are questions of fact, however, concerning whether Defendant was negligent in allowing workplace

harassment to continue from December 2013 until Plaintiff requested that he be laid off in February 2014. *See Howard v. Winter*, 446 F.3d 559, 567 (4th Cir. 2006) ("[T]here are questions of fact as to whether the [defendant's] response was reasonable."). Plaintiff's hostile work environment claims related to this period will remain.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part. A separate order will follow.

```
              _____/s/_____
              DEBORAH K. CHASANOW
              United States District Judge
```